# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00528-CR

**Eric Michael White, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 61643, HONORABLE JOE CARROLL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Eric Michael White guilty of injury to a child with intent to cause serious bodily injury, a first-degree felony. *See* Tex. Penal Code Ann. § 22.04(a)(1), (e) (West Supp. 2009). The trial court assessed White's punishment at life imprisonment. In his sole point of error, White contends that the trial court erred in denying his motion for new trial based on ineffective assistance of trial counsel. Because we conclude that White did not carry his burden of proving that his trial counsel provided ineffective assistance, we affirm the trial court's judgment.

## BACKGROUND

At about 9 p.m. on May 30, 2007, Jolynn Cammisa left her home to pick up beer for White, her live-in boyfriend. White had asked her to get the beer from a room he had at his barracks on Fort Hood. At first, Cammisa planned to take her seven-month-old daughter, S.B., with her on the errand. In preparation for doing so, she changed S.B.'s diaper and clothes. She then laid S.B.

on a mattress on the floor next to a computer where White was playing video games. She asked White to watch the baby while she got dressed to leave. When Cammisa returned after dressing, White was patting S.B. on her back, and S.B. had fallen asleep. White told Cammisa that she could leave S.B. at home and he would take care of her. Cammisa testified at trial that White had had "a few beers" at the time she left the house.

Cammisa testified that it took her about fifteen minutes to get to the barracks. While she was there, at 9:26 p.m., she called White to ask him how S.B. was doing, but White did not answer his phone. Cammisa got the beer and started back home, stopping only briefly on the way to take a photo of the full moon with the camera on her mobile phone. When she arrived at her house and was about to unlock the side door, White opened the door from the inside. He was holding S.B., and he told Cammisa that S.B. had fallen off the couch and was not moving. Cammisa took S.B. from White and carried her into the living room, where she laid her on the floor. Cammisa noticed dried blood around S.B.'s nose and mouth and a "very, very large" bump on the side of her head. Cammisa asked White if he had called 9-1-1, and he said he had not. She told him to do so but he instead went into another room and returned with S.B.'s car seat. Cammisa told him they could not take S.B. to the hospital and repeated that they had to call 9-1-1, but White told her that he could not find a phone. She told him that there was a phone on the microwave in the kitchen, and he got the phone and called 9-1-1. Meanwhile, Cammisa was rubbing S.B.'s stomach and talking to her. As she did so, S.B. started to move in "jerky" motions that "weren't normal baby movements" and started moaning in an abnormal way. Cammisa noticed that S.B.'s blue eyes had turned almost completely white and that her eyelids were half-closed.

2

A 9-1-1 operator received the call from White at approximately 9:45 p.m. and immediately dispatched paramedics to the scene. Paramedic John Woljevach arrived at Cammisa's house to find S.B. on the floor of the home in front of the couch and Cammisa and White nearby. Woljevach asked Cammisa and White what had happened to S.B., and they both told him that S.B. had fallen off of the couch and hit her head on a plastic baby-wipes box. Woljevach noticed a stain on White's shirt that appeared to be blood. He also noticed that S.B. was not moving, her eyes were open, she had a "gazed" look, and she did not respond to noises in front of her. S.B. also had a knot the size of a golf ball on the side of her head, scratches on her chin, bruises on her eyes and arms, and dried blood on her nose, lip, and left hand. Upon assessing S.B.'s condition, Woljevach called for a helicopter to fly her to a hospital in Temple. He also contacted a dispatcher to request that police officers be sent to the scene based on his determination that S.B.'s injuries were not consistent with a fall from the couch.

In the ambulance on the way to meet the helicopter, S.B. began "decerebrate posturing," pushing her arms away from her body in a way that indicated a brain injury. One of her pupils also began dilating, indicating pressure in the brain, and the knot on her head grew in size. After transferring S.B. to the helicopter, Woljevach returned to Cammisa's home to speak with police officers. Upon returning, he noticed that White had taken off his shirt.

Police Officer Cassandra Fulton arrived at the scene, where she interviewed Cammisa and White. White told Fulton that S.B. had fallen off the couch and hit her head on a baby-wipes box. In a written statement, he wrote:

3

[S.B.] was sleepin[g] in her bed and woke up. I picked her up and patted her back to sleep. I put her down on the couch to go get a bottle, I heard a thud, turned around and [S.B.] was on the ground. I ran over to her and she wasn't moving. I picked her up, started looking for my phone, heard [Cammisa's] car, opened [the] door, and told her [S.B.] had just fell [sic] off the couch and wasn't movin[g]. She took her and I called 911. We do not discipline her due to her age.

Cammisa told Fulton that S.B. was asleep on the mattress on the floor of the master bedroom when she left the house. While Fulton was in the home, she also noticed a hole in the living-room wall, which Cammisa said she had caused by punching the wall two weeks earlier during an argument with her mother. Fulton collected the shirt White had previously been wearing and a sheet from the mattress on the floor of the master bedroom that also appeared to have blood on it.

By the time the helicopter transporting S.B. arrived at the hospital in Temple, S.B. was in critical condition and in a coma. One of her doctors testified that there was massive swelling in her brain, her brain was bleeding, she had several skull fractures, and she had retinal hemorrhages. The doctor also found three partially healed rib fractures that he estimated had occurred at least seven to ten days earlier.

S.B. spent more than two months in the hospital, where she underwent brain surgery. When she was released from the hospital, her father and grandparents took her to live with them in California. S.B. had two surgeries on her skull after arriving in California. At the time of trial, she was legally blind and had limited use of the left side of her body. She was also developmentally delayed, both physically and mentally.

According to the testimony of Dr. David Hardy, a pediatric critical care physician and one of the physicians who treated S.B. when she first arrived at the hospital in Temple, the injuries

4

suffered by S.B. could not have been caused by a fall from a couch. He felt so certain that a fall from the couch could not have caused her injuries that it was "not even a close call" for him to make. Rather, he testified that injuries like S.B.'s were the kind he saw in children who were unrestrained in high-impact car accidents in which they were thrown from the car or children who had been hit in the head with a baseball bat or slammed against an object. Dr. Hardy also testified that the injuries S.B. suffered would have caused immediate symptoms, such as loss of consciousness, unusual facial expressions, a blank stare, and posturing. He testified that it would have been immediately obvious and "profoundly noticeable" that she was hurt. He testified that the observations of the paramedic who arrived on the scene were consistent with his expectations.

White was indicted for intentionally or knowingly causing serious bodily injury to S.B. by striking or hitting her with a deadly weapon or throwing, pushing, or slamming her against a deadly weapon. A jury found him guilty as charged in the indictment. White elected to have the trial court assess his punishment, and the trial court sentenced him to life imprisonment. After receiving his sentence, White filed a motion for new trial, alleging that he was denied effective assistance of counsel. After a hearing, the trial court denied the motion. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). Accordingly, when analyzing the trial court's decision to deny a new trial based on ineffective assistance of counsel, we view the relevant legal standards through the prism of an abuse-of-discretion standard. *See Garza v. State*, 261 S.W.3d 361, 364 (Tex. App.—Austin 2008, pet. ref'd). We do not substitute our judgment for

5

that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. *Charles*, 146 S.W.3d at 208. We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were so made. *Id*. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id*.

## DISCUSSION

To prevail on a claim of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986) (adopting *Strickland* two-prong test). To establish deficient performance as a matter of law under the first prong, a defendant must show that no reasonable trial strategy could justify counsel's conduct. *See Strickland*, 466 U.S. at 689; *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). A defendant establishes prejudice under the second prong if he shows that a reasonable probability exists that, but for the deficient performance, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

It is the defendant's burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). In determining whether an attorney's performance was deficient, we apply a strong presumption that the attorney's conduct was within the wide range of reasonable professional assistance. *Id*. We review the effectiveness of counsel in light of the totality of the representation and the circumstances of each case. *Id*. In most cases, an undeveloped record on direct appeal is insufficient to satisfy the requirements of *Strickland* because the reasonableness of counsel's decisions often involves facts not appearing in the appellate record. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). Without evidence of the strategy and methods involved concerning counsel's actions at trial, an appellate court should presume a sound trial strategy. *See Thompson*, 9 S.W.3d at 814.

### Deficient Performance

White contends that the totality of the circumstances of his trial counsel's representation establish that his trial counsel provided ineffective assistance of counsel. The "totality of the circumstances" alleged by White include eight allegations of deficient performance. Specifically, White asserts that his trial counsel failed to: (1) seek out and interview potential witnesses for the guilt/innocence and punishment phases of trial; (2) adequately investigate a photograph taken by Cammisa that may have shown Cammisa to be lying; (3) present available defense theories during the guilt/innocence phase of trial; (4) pursue a dismissal of the charges before trial; (5) make a proper objection to the admission of voluminous medical records; (6) obtain a ruling on his fourth motion in limine; (7) allow appellant to testify during the guilt/innocence phase of trial; and (8) adhere to the motion in limine. We address each allegation in turn.

7

A.     **Failure to Seek Out Potential Witnesses**

In his first allegation of deficient performance, White contends that his trial counsel, Michael White ("Counsel"),[1] failed to make reasonable efforts to present the testimony of several witnesses who would have aided White's defense during the guilt/innocence and punishment phases of trial. At the hearing on White's motion for new trial, White presented six witnesses who he alleged were available to testify but were not called to do so during the trial. The witnesses included Debbie Hefner, one of White's friends; Jane Anderson, White's mother; Willamina Nolten, White's former mother-in-law; Raycinda Buxton, one of White's former co-workers; Lucy Day, another of White's former co-workers; and Nicholas Hefner, another of White's friends. White also presented a seventh witness—Sergeant Brady Miller, his supervisor—who had testified at the punishment phase of trial but not at the guilt/innocence phase. None of the witnesses had any knowledge of the circumstances of the crime itself; rather, they all testified generally that they felt White was not capable of harming a child, and some of them further testified that they were so confident in White's child-care abilities that they would leave their own children or grandchildren in his care.

Two of the witnesses, Anderson and Miller, complained of Counsel's contact with them during White's trial. Anderson testified that Counsel's office called her to tell her the date of the sentencing hearing only two days before the hearing. Because she lived in New York and did not have the money for an airplane ticket on such short notice, she was unable to attend the hearing. Anderson also testified that she called Counsel's office a number of times trying to reach him but

_____

[1] Because White and his trial counsel share the same surname, we will call trial counsel "Counsel" throughout this opinion to avoid confusion.

8

always had to leave a message asking him to call her back. She testified that he never returned her calls. Miller testified that he was never contacted by Counsel during the trial. He explained that he learned of White's sentencing hearing only because someone from the probation office called to ask him a question about White's military status in the event of a conviction. He decided to attend White's sentencing hearing of his own accord, and when he arrived, White introduced him to Counsel. It was at that point that Counsel suggested Miller testify on White's behalf, which Miller agreed to do. Miller further testified that if Counsel had contacted him, he could have given Counsel the names of a number of soldiers who would also have testified as to White's good character.

Counsel commented on this issue at the sentencing hearing and the hearing on White's motion for new trial. At the sentencing hearing, Counsel stated:

> Your Honor, for purposes of the record, the PSI does reflect some—the family relationship that [White] has with some relatives in New York.
>
> My paralegal and I have made exhaustive efforts to contact relatives. We actually had a sister on the phone. We had his mother on the phone, and some other members of his family on the phone. They've advised me they could not afford the trip to Texas from New York; and [White] has represented that to me on previous occasions, at pretrials and at the trial, that that would sort of be cost prohibitive for them, as well.
>
> Michael Harris has been somebody referred to today. We reached out to him. His numbers aren't good any more. He left us about three or four phone numbers. He told me he was soon to deploy to Iraq. And those are pretty much the exhaustive list that we've tried to contact, other defense witnesses for purposes of the sentencing hearing today.

At the hearing on the motion for new trial, Counsel responded to several questions about possible defense witnesses. Regarding his contact with White's mother, Counsel stated that

he had notified White's mother on three different occasions that he represented White. He testified that she informed him from the beginning that she could not afford to travel to Texas. Regarding other witnesses, Counsel testified that he attempted to contact every witness whose name White gave him and that he asked White for additional witnesses, but White told him he had no additional witnesses at that time. He testified that the only names White gave him as possible witnesses in the guilt/innocence phase of trial were those of Michael Harris and his wife, who had been at Cammisa's home earlier in the day on the day of the crime. Counsel stated that he contacted the husband on several occasions and that the couple eventually ended up providing statements. Counsel testified that parts of the couple's statements were helpful to White and parts were "pretty bad." The negative aspects of their statements were highlighted when the prosecutor used portions of the statements to impeach White at the punishment hearing, and White's new attorney ("Appellate Counsel")[2] later called the portions "damning extracts" at the hearing on the motion for new trial. Thus, the record shows that the statements would not necessarily have been beneficial to White.

Further, the record is otherwise silent as to the significance and relevance of the couple's statements. The record suggests that the couple was at Cammisa's home earlier in the day on the day of the crime, but there is nothing in the record to suggest that either of them was a witness to the circumstances of the crime itself. The portions of their statements used to impeach White at his punishment hearing addressed contact the couple had with White at some point after the day of the crime. Specifically, the portions of the statements used for impeachment purposes focused on

---

[2] To avoid confusion between White's trial attorney and the attorney who has represented him since he filed a motion for new trial, we will call his current attorney "Appellate Counsel" throughout the rest of the opinion.

ways in which the story White told the couple about what happened on the night of S.B.'s injury differed from the story he told police. Given the lack of evidence in the record establishing the relevance of the Harrises' statements, and given the potentially harmful nature of portions of their statements, we conclude that White has failed to rebut the presumption that Counsel's decision to not offer their statements was a reasonable one.[3] *See Thompson*, 9 S.W.3d at 814.

Regarding Miller, Counsel testified that he spoke with Miller two times. He stated that Miller was a "[v]ery nice gentleman, but [had] nothing relevant regard[ing] . . . guilt or innocence." Counsel also testified that he contacted a female whom he believed to be White's sister. When the woman answered the phone, she stated that she did not consider herself to be White's sister. Counsel explained that White told him he had a "very strained relationship with his family members and didn't know if they would be of any benefit." Counsel testified that when he contacted White's family members, "what [White] had told [him] rang true as [he] spoke to them on the phone."

Although White presented several witnesses at the hearing on his motion for new trial who were not presented during his trial, the record provides plausible explanations as to Counsel's reasons for not calling the witnesses during trial, particularly considering that we must view Counsel's conduct from his perspective at the time the conduct occurred and not with the benefit of

---

[3] Regarding the Harrises' live testimony, we have already addressed Counsel's testimony at the punishment hearing that he tried to contact Michael Harris but that Harris's "numbers [weren't] good any more" and that Harris told him "he was soon to deploy to Iraq." Because the record is silent as to whether Harris's wife was available to testify, and if so, Counsel's reasons for not calling her as a witness, we do not address the issue. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

hindsight. *See Robertson v. State*, 187 S.W.3d 475, 482 (Tex. Crim. App. 2006) (quoting *Strickland*, 466 U.S. at 689) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Counsel testified that he contacted all of the witnesses provided to him, including some of White's relatives, and the witnesses he spoke with either could not or would not attend the hearings. Further, although Anderson testified that she was contacted only days before the sentencing hearing and Miller testified that he was not contacted at all, the trial judge, as the sole judge of the credibility of the witnesses, was free to believe Counsel's testimony and disregard the testimony of Anderson and Miller. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); *Acosta v. State*, 160 S.W.3d 204, 210 (Tex. App.—Fort Worth 2005, no pet.). Accordingly, we reject White's allegation.

### B. Failure to Investigate Photo Taken by Cammisa

White's second allegation of deficient performance is that Counsel failed to investigate the contents of a photo taken by Cammisa. During the trial, Cammisa testified that after leaving White's barracks on the night of the crime, she took a photo of the full moon using the camera on her mobile phone. During Miller's testimony at the hearing on the motion for new trial, White introduced a photo taken by Miller the day before the hearing that depicted a "7-Eleven" convenience-store sign, overhead power lines, and a power-line pole in a location that alleged was less than a mile from Cammisa's home. Appellate Counsel alleged that the original photo taken by Cammisa also contained a 7-Eleven sign and power pole, neither of which could be found near White's barracks. In his brief, White contends that the photo taken by Miller suggests that Cammisa

12

lied about where she was when she took the photo. As further support for his contention, White also points out that while he was being interrogated by an investigator for the district attorney's office after he took a polygraph test, the investigator told him that the photo of the moon could not have been taken at Fort Hood. Consequently, White alleges that Counsel's failure to investigate the contents of the photo as a possible avenue for attacking Cammisa's credibility constituted deficient performance.

At the hearing on the motion for new trial, the only question asked of Counsel regarding his reasoning for not further investigating the photo was why he did not investigate in response to the district attorney investigator's comment to White that the photo could not have been taken at Fort Hood. Counsel stated: "I'm assuming that [the investigator] doesn't know that [the photo could not have been taken at Fort Hood]. That's a common technique that's used, whether it's involving a polygraph or not."

Considering the lack of evidence in the record, we conclude that Counsel's performance was not deficient. To begin with, the original photograph taken by Cammisa is not in the record. Thus, it is unclear whether the photo taken by Miller the day before the hearing on the motion for new trial did or did not resemble the original photo. In addition, the only testimony Cammisa offered regarding the photo was that she took it "as [she] was leaving [White's] barracks room." She did not specify an exact location. Thus, it is not clear from the record that the location of the photo holds any significance regarding Cammisa's credibility.[4] Further, White did not call

---

[4] White also fails to address the fact that the photo, regardless of where it was taken, still establishes that Cammisa was not at home prior to the time that S.B. began showing signs of injury.

the district attorney's investigator to the stand to testify as to his statement that the photo could not have been taken at Fort Hood. Thus, the record does not provide any evidence to support the truth or reasoning of the investigator's comment. Accordingly, White's allegation is not firmly founded in the record. *See Thompson*, 9 S.W.3d at 814.

In addition to the absence of evidence in the record, we also note that Counsel's explanation—that he assumed that the investigator's comment was part of a common interrogation technique—is a plausible basis for his decision not to inquire into the matter further. Because the record does not affirmatively demonstrate the alleged deficient performance, and because Counsel provided a reasonable explanation for his decision not to investigate the photo further, we reject White's allegation.

### C. Failure to Present Available Defense Theories

In his third allegation of deficient performance, White asserts that Counsel failed to explore Cammisa's history of punching holes in walls and failed to explore several other comments made by the district attorney's investigator about Cammisa's credibility during the investigator's interrogation of White. Specifically, White contends that Counsel failed to: (1) cross-examine Cammisa about her history of punching holes in walls; (2) present the testimony of Cammisa's mother regarding Cammisa's history of punching holes in walls; (3) present to the jury a comment made by the district attorney's investigator that if White did not give a statement saying that Cammisa hurt S.B., White would be "thrown under the bus"; (4) present to the jury a comment made by the district attorney's investigator that he had statements from Cammisa's neighbors that Cammisa's car never left the house that night; and (5) present to the jury a comment made by the

14

district attorney's investigator that a friend of Cammisa's who Cammisa testified she saw at the barracks the night of the crime had told police that he did not see her that night.

We first note that the record is silent as to Counsel's reasoning for not calling Cammisa's mother as a witness. Thus, White has failed to rebut the presumption that Counsel's decision was a reasonable one. *See id.* Regarding Counsel's reasoning for not cross-examining Cammisa about her history of punching holes in walls, Counsel explained that he "did cross-examine [Cammisa] on a number of things, including the hole in the wall and the injuries of the child and some other things." Counsel further explained his cross-examination of Cammisa as follows:

> There [are] some [possible credibility issues] that I explored and went through with [Cammisa]. There is some trial strategy because you have to be very careful when you're cross-examining the mother of . . . a severely disabled child. So I crossed her on the fact that there was in the medical records additional injuries, rib fractures, bruisings and even injuries that occurred that day to [S.B.'s] eye with a toy, some other injuries that as a mother that she knew or should have known of those existing injuries, those pre-existing injuries, and that in fact she might be responsible for those injuries. And I went into those areas in front of the jury.

The record shows that during the trial, Counsel questioned Cammisa about a hole that was punched in the wall approximately two weeks before the crime occurred. Cammisa admitted that she punched the hole in the wall during an argument with her mother. Counsel also asked Cammisa about the other injuries to S.B. that doctors discovered—specifically, S.B.'s partially healed rib fractures. Counsel asked Cammisa to confirm that the doctors' estimate of the time S.B.'s rib fractures most likely occurred was about the same time that Cammisa punched a hole in the wall, and Cammisa confirmed that it would have been about the same time.

15

Although Counsel did not question Cammisa about a *history* of punching holes in walls, he questioned her about the hole in the wall that was most relevant to the case and that raised implications about her temper and the possibility that she could have harmed S.B. on the day of the crime. Counsel's explanation that he felt he needed to be careful when cross-examining the mother of a severely disabled child provides a reasonable basis for limiting his cross-examination of Cammisa to the most relevant issues.

Regarding the comments made by the district attorney's investigator that seemed to cast suspicion on Cammisa, Counsel testified that he did not present the testimony of the district attorney's investigator because he did not think the investigator "spoke for the department." When questioned as to whether the investigator's comments would have been admissible at trial, Counsel stated:

> If [they] had been admissible, I think that it would have also been admissible that there [are] a dozen other alternate theories as to how [White] committed this crime as well. So, no, I would not have explored that area. I would not call [the investigator] or anyone else in the D.A.'s office to go into all the possible theories as to why [White] might be guilty or why he might not be guilty. No.

Regarding the reasons for the investigator's comments, Counsel further stated:

> That might have been [the investigator's] personal opinion or that might have been [his] modus operandi for interrogating someone or talking to someone after a polygraph, or an alternate theory. I'm not going to go into that area. And that would be bad trial strategy to sit there and have them go further into all the possible theories of why [White] might be guilty.

16

When asked about the same issue by the prosecutor, Counsel stated that "the rule is that you don't ask questions you don't know the answer to, and you certainly don't call witnesses to testify that you don't know exactly what they are going to say."

Counsel's explanation provides a reasonable basis for his decision not to present the comments of the district attorney's investigator to the jury. Counsel did not know whether the investigator's comments were an interrogation tactic, a theory about the crime, or something else. Raising the issue could have opened the door to testimony that could have been harmful to White, and Counsel was not ineffective for deciding not to elicit testimony that could have been more harmful than helpful to his client. *See Damian v. State*, 881 S.W.2d 102, 110 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). In addition, White did not present the testimony of the investigator at the hearing on the motion for new trial and did not otherwise present evidence supporting any of the investigator's comments. Thus, he failed to develop the record sufficiently to establish deficient performance. *See Thompson*, 9 S.W.3d at 814.

### D. Failure to Pursue Pre-trial Dismissal

In his fourth allegation, White contends that Counsel failed to seek a pre-trial dismissal of the case based on evidence that White's polygraph examination had been "rigged." Specifically, White refers to a comment made by the polygraph examiner to White after the polygraph examination to the effect that White could not have known if Cammisa was present when S.B. received her injury if White had not seen the injury inflicted or been told by Cammisa that she

harmed S.B.[5]  At the hearing on the motion for new trial, Appellate Counsel asked Counsel how White could have answered the question "Was [Cammisa] present when the child sustained her injuries?" without being deceptive if White did not know when the injuries occurred.  After a series of sustained objections, Counsel was never able to answer the question.  When questioned about whether he told the prosecutor that he thought the polygraph was rigged, Counsel answered, "No." Although Counsel stated that he did not think the polygraph was fair, Appellate Counsel never asked Counsel if he believed the polygraph was intentionally rigged, or if he did so believe, why he did not inform the prosecutor of the situation or pursue a pre-trial dismissal in the case.  Because the record is silent as to Counsel's thoughts and reasoning on the matter, White has failed to rebut the presumption that Counsel's decision was reasonable. *See Thompson*, 9 S.W.3d at 814.  We therefore reject White's allegation.

### E.    Failure to Make Proper Objection to Medical Records

White's fifth allegation of deficient performance is that Counsel failed to object to the admission of 2,215 pages of medical records on the basis that the volume of the records made them substantially more prejudicial than probative under Rule 403 of the rules of evidence. *See* Tex. R. Evid. 403.  When the prosecution moved to admit the medical records at trial, Counsel objected to the records based on allegations that the records contained hearsay and violated the Confrontation

---

[5]  The record shows that White's depiction of the polygraph examiner's comment is inaccurate.  The videotape of White's interrogation shows that the polygraph examiner's comment to White was made in response to White's statement that he did not see Cammisa hurt S.B. but that he "knew" that she must have done so.  The examiner responded that White could not have known that Cammisa harmed S.B. if he had not seen the injury inflicted or been told by Cammisa that she did so.  No reference was made to White's knowledge of Cammisa's presence at the house.

18

Clause of the U.S. Constitution. Counsel asked for a running objection on those bases, which the trial court denied. Counsel did not object based on Rule 403 of the rules of evidence.

Although White argues that Counsel should have objected based on Rule 403, the record does not provide evidence of Counsel's reasoning for not objecting on that basis. At the hearing on the motion for new trial, Appellate Counsel made comments about the volume of the records but did not question Counsel about the issue. Because the record is silent as to Counsel's reasoning, White's complaint as to this issue is not firmly founded in the record. *See Thompson*, 9 S.W.3d at 814.

### F. Failure to Obtain a Ruling on Fourth Motion in Limine

In his sixth allegation of deficient performance, White asserts that Counsel failed to obtain a ruling on his fourth motion in limine, which requested that the prosecution be required to first seek permission of the trial court outside the presence of the jury before questioning any witness regarding matters about which the witness did not have personal knowledge. At a pretrial hearing, the trial court granted Counsel's first three motions in limine before turning to the fourth motion. In addressing the fourth motion, the trial judge stated that he believed that matters not within the personal knowledge of the witnesses would best be handled by objections during the trial and that he would be alert for any such objections Counsel might make. The trial judge went on to conclude that he was "not going to grant that ahead of trial." Thus, the trial court denied Counsel's motion. Accordingly, Counsel did not fail to obtain a ruling on the motion.

Even if Counsel had not obtained a ruling, the record is silent as to any reasoning for not doing so. Thus, White has failed to rebut the presumption that Counsel's decision was a reasonable one. *See id*.

G.      **Failure to Allow Appellant to Testify**

White's seventh allegation of deficient performance is that Counsel "refused" to allow White to testify during the guilt/innocence phase of trial. White attached an affidavit to his motion for new trial in which he stated that he "asked, during the Guilt/Innocence phase of the trial, to be allowed to testify and was told (by [Counsel]) 'No, your [juvenile] record will be used against you' . . . ." When questioned about the issue at the hearing on the motion for new trial, Counsel stated that he talked to White about White's testimony "many times," and that the decision for White not to testify at the guilt/innocence phase was White's "ultimate decision" but was based on Counsel's advice that White not testify.

Although both Counsel's and White's statements support a determination that Counsel advised White not to testify, there is no evidence in the record that Counsel "refused" to allow White to testify, and White did in fact testify during the punishment phase despite Counsel's advice against it. Thus, White fails to show how Counsel refused to allow him to testify at the guilt/innocence phase of trial but did not refuse to do so during the punishment phase even though Counsel advised against him testifying in both phases. Further, Counsel was not questioned at the hearing on the motion for new trial as to his reasoning for advising White not to testify. Thus, the record reveals only White's statement that Counsel's reasoning was based on the potential danger of White's juvenile record being used against him. Given the reasonableness of Counsel's fear that

20

White's juvenile record may harm him more than his testimony would help him, and given the strong presumption of sound trial strategy we must apply to ineffective assistance claims, we reject White's allegation. *See id*.

### H. Failure to Adhere to Motion in Limine

In his eighth allegation of deficient performance, White contends that Counsel was deficient in purposely eliciting evidence of extraneous offenses and thus violating his own motion in limine, which excluded any references to extraneous offenses without the trial court first conducting a hearing outside the presence of the jury. The specific evidence of extraneous offenses that Counsel allegedly elicited was testimony about the partially healed rib fractures suffered by S.B. approximately two weeks prior to the crime. At the hearing on the motion for new trial, Appellate Counsel asked Counsel why he allowed the prosecution to elicit testimony regarding the partially healed rib fractures without first objecting and asking the trial court to hold a hearing outside the presence of the jury. In response, Counsel stated:

> I actually brought out the testimony regarding the previous injuries to the child. I think [the doctor] touched on it during direct with the State, but I actually went into it because I thought that was trial strategy to show that those injuries pre-existed the day that [White] was accused of this offense and could possibly have been [Cammisa].

In the trial exchange referenced by Counsel, he asked Cammisa several questions about the partially healed rib fractures discovered by doctors who treated S.B. Cammisa testified that she was aware that the doctors discovered the rib fractures but that she had never noticed injuries like that on S.B. Cammisa acknowledged that the time that the doctors estimated the rib fractures

21

likely occurred—two weeks prior to the crime—was the same time that she had punched a hole in the wall during an argument with her mother. Counsel then went on to question Cammisa about several bruises found on S.B. and whether Cammisa knew the cause of the bruises. He also elicited testimony from Cammisa in which she stated that she never saw White injure S.B. in any way.

The questions Counsel posed to Cammisa about the preexisting injuries to S.B. suggested that the injuries could have been caused by Cammisa, not White. Thus, we disagree that evidence of the injuries constituted evidence of "extraneous offenses" committed by White. Further, Counsel's decision to bring up the issue of the previous injuries was reasonable given the constraints within which he had to develop his trial strategy. Specifically, Counsel's strategy had to incorporate White's statement to police that Cammisa was not present prior to S.B. showing signs of injury and the doctor's testimony that S.B.'s injury would be immediately obvious after it was inflicted and could not be caused by a fall from a couch.

At the hearing on the motion for new trial, Counsel explained that it was his strategy throughout trial to raise a reasonable doubt that White committed the crime and that he attempted to do so by offering evidence suggesting that Cammisa could have committed the crime. He testified that given White's unwavering position that Cammisa was not present for a substantial period of time before S.B. showed signs of injury, he had to do "the best [he] could, even against the medical experts that testified, to say that this might have happened earlier in the day or right prior to [Cammisa] leaving the home . . . ." Considering the evidence Counsel had to work with, it is reasonable that he would choose to cross-examine Cammisa about injuries to S.B. that occurred

approximately two weeks prior to the crime and at about the same time that Cammisa punched a hole in the wall of her home. We therefore disagree that Counsel's conduct was deficient.[6]

## I.  Conclusion Regarding Deficient Performance

Because we reject White's allegations, we conclude that White has failed to prove by a preponderance of evidence that his counsel's performance was deficient. *See Strickland*, 466 U.S. at 689; *Andrews*, 159 S.W.3d at 102.

### Prejudice

Even if we had determined that Counsel's performance was deficient, White fails to prove the second element of his claim: that Counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland*, 466 U.S. at 687-88. As previously stated, for White to establish the second element of his claim, he must show that there is a reasonable probability that, but for his counsel's deficient performance, the outcome of the proceeding would have been different. *See id*. at 694. White fails to show that absent any errors by Counsel, there is a reasonable probability that the jury would have found him not guilty of the crime.

---

[6] White also cites to *Robertson v. State*, 187 S.W.3d 475 (Tex. Crim. App. 2006), in support of his argument that Counsel provided ineffective assistance by questioning Cammisa about S.B.'s partially healed rib fractures. However, *Robertson* is distinguishable from this case. In *Robertson*, trial counsel elicited testimony from the defendant regarding the defendant's previous convictions and incarcerations in an effort to establish that the defendant was truthful. 187 S.W.3d at 480-81. Here, Counsel elicited testimony from another witness about previous injuries to the victim in an effort to establish that the other witness, not the defendant, was responsible for the injuries. Because *Robertson* is substantially different from this case, we are not persuaded by White's argument.

In the statement White gave to police officers who arrived on the scene, he claimed that when S.B. woke up from a nap, he picked her up and patted her until she fell back to sleep. He stated that he then laid her down on the couch and went to get a bottle. At that point, he heard a thud, turned around, and saw S.B. on the ground. She was not moving. He picked her up and began looking for a phone when he heard Cammisa arrive at the home. He told Cammisa that S.B. had fallen off the couch and that she was not moving. White did not change his version of events at any time before or during trial.

The paramedic who first arrived at the scene testified that upon his arrival, S.B. was not moving, her eyes were open, she had a "gazed" look, and she did not respond to noises in front of her. He testified that S.B. also had a knot the size of a golf ball on the side of her head, scratches on her chin, bruises on her eyes and arms, and dried blood on her nose, lip, and left hand. He further testified that S.B.'s condition worsened quickly once she was in the ambulance on the way to the helicopter. The physician who treated S.B. when S.B. arrived at the hospital testified that the injuries S.B. suffered would have caused immediate symptoms such that it would have been immediately obvious and "profoundly noticeable" that she was hurt. The doctor testified that the observations of the paramedic who arrived on the scene were consistent with his expectations.

Given the evidence of the severity of S.B.'s injuries and the immediacy with which the injuries would have become apparent, and given both Cammisa's and White's unvarying positions that Cammisa was not present at the time S.B. started showing signs of injury, we conclude that White has not shown a reasonable probability that, but for his allegations of deficient performance, the outcome of the proceeding would have been different. *See id.* Even if Counsel had done all the things that White alleges he should have done—including calling additional character

24

witnesses to testify that they knew White to be good with children; further investigating Cammisa's credibility and history of violence; raising a pre-trial allegation that White's polygraph was rigged; objecting to the amount of medical records admitted at trial; and permitting White to testify at trial[7]—none of his conduct would have led to evidence that contradicted or otherwise affected the existing evidence that by White's own account, he was the only person with S.B. when she began showing signs of an injury that, according to expert medical testimony, would be immediately noticeable upon infliction and could not be caused by a fall from a couch. That evidence alone could lead a reasonable jury to find White guilty. Accordingly, even if White had proven that Counsel's performance was deficient, he has failed to prove that he was prejudiced by Counsel's actions. *See id.*

## CONCLUSION

Because White has failed to prove by a preponderance of the evidence that his trial counsel provided ineffective assistance, we affirm the trial court's judgment.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Affirmed

Filed: February 26, 2010

Do Not Publish

---

[7] We assume that White's testimony at trial would have been the same as his testimony at the sentencing hearing, in which he maintained the same story as he had provided to police: that he was alone with S.B. when she fell off the couch and began showing signs of injury.

25